JAMES H. JOHNSON, RESPONDENT, v. HENRIETTA A. INGRAM, APPELLANT.—178 S. W. (2d) 821.

Kansas City Court of Appeals. January 31, 1944.

*Walter A. Raymond* for appellant.

*Nelson E. Johnson* and *B. A. Mintonye* for respondent.

BLAND, J.—This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $873, and defendant has appealed.

The facts show that plaintiff, at the time he was injured, had been employed by defendant as janitor, for five years, at a thirty-six-apartment building owned by defendant in Kansas City; that the building was heated by means of steam, the furnace being located in the base-

ment; that the furnace and boiler stood in a pit about eighteen inches below the level of the basement floor; that the furnace was fed coal by a mechanical stoker; that the stoker was located a few feet to the west of the furnace and set in a deeper pit than that in which the furnace was located. It was one of the duties of the plaintiff to fire this stoker and attend the furnace. Plaintiff coaled the stoker from a coal bin located in the northwest corner of the basement, a short distance from the stoker. Along the south wall of the basement there was a passageway about eight feet in width. Along the north edge of this passageway there was a row of brick pillars about two and one-half feet square and painted white. One of these pillars formed the north boundary of this passageway and was located directly south of the stoker. The pit, where the stoker was located, was surrounded by an inclining ramp on the south, west and north. The ramp led down to a brick wall around the stoker from which there was a perpendicular drop of several feet to the level on which the base of the stoker stood. The ramp was shaped like a horseshoe and the stoker stood at the east or open end of it. The ramp extended to the south edge of the pillar above mentioned and to within one foot of the west wall of the basement and to the north wall.

Plaintiff's evidence was that the ramp, on the south side of the stoker, sloped downward toward the stoker at an incline of what he thought to be forty-five degrees. In other words, in a horizontal distance of three and one-half or four feet north from the edge of this part of the ramp and toward the stoker there was a drop of about three feet. The surface of the ramp was made of smooth concrete and was slick. There was a perpendicular pit about three feet deep immediately surrounding the stoker. There was no steps down to the stoker or to the furnace and no railing along the edge of the incline or the ramp.

In feeding the stoker plaintiff was required to bring the coal from the bin on the west side of the basement down that part of the ramp in front of the stoker. In walking down the ramp plaintiff had fallen several times. He complained to defendant about its dangerous condition and two months before plaintiff was injured another man had fallen on the ramp on the south side. Plaintiff had reported this fact to defendant. Defendant assured plaintiff that these conditions would be remedied. Plaintiff testified that he relied upon her promise and continued his work.

Defendant employed plaintiff to reduce the grade of the ramp between the stoker and the coal bin on the west and agreed to pay him extra compensation for that work. He was instructed to do nothing with reference to the south side of the ramp which led from the passageway down to the stoker. He was to work only on the west side. Defendant was to have someone else put in a guardrail along the south side of the ramp. For three or four weeks before plaintiff was in-

jured he had been putting cinders in the pit around the stoker for the purpose of filling it up. He had broken up some concrete and dug out some dirt in front of the furnace. Plaintiff had last worked on the west side of the ramp on the evening before the morning he was injured, the latter event occurring on the morning of November 2, 1941, about 11:00 A. M.

Plaintiff was in the basement standing about even with or a little to the west of the white brick pillar located directly south and opposite the stoker. He was facing east and talking to a friend, one Vann who was standing near the boiler of the furnace. There was a door at the west end of the passageway. While plaintiff was talking to Vann defendant's husband came in this door, which closed automatically behind him. Plaintiff turned and stepped west about two and one-half feet, facing north, for the purpose of pointing out to and showing defendant's husband how much concrete he lacked to complete the job. At that time plaintiff had filled in the space between the coal bin and the stoker to a height lacking one inch of the desired level. Plaintiff testified: "When I turned around I went to show him and my feet went out from under me. . . . I just turned around and went right down." He fell backward in a sitting position. He received injuries to his back and left hip. Plaintiff testified that defendant had instructed him not to turn on the lights that were present "because the light bills were too high;" that he could not see where he was stepping and that while there were some nearby windows, and the door to the west had a glass in it, all of the windows were boarded up but one and the light form this window was obstructed; that the door had a piece of sheet iron over the glass part.

Plaintiff had worked around the furnace and stoker for a period of five years. He testified that he had gone over the place where he fell "countless times" before.

Plaintiff's witness, an expert engineer and architect, testified that architects "tried not to get a ramp over ten degrees;" that "fifteen degrees, in my estimation, is a steep ramp;" that the maximum grade of a ramp which can be used with safety is not over fifteen per cent; that he had never seen a ramp with an incline of forty-five degrees for people to walk on; that a man of ordinary prudence would not try to use a forty-five degree incline "not in ordinary conditions; if an emergency, he would try to slide down it." Plaintiff testified that he was familiar with concrete work, knew what an angle of forty-five degrees was and his counsel prepared a wooden exhibit which he displayed before the jury to represent and illustrate a forty-five degree slope.

Defendant insists that her instruction in the nature of a demurrer to the evidence should have been given, because, at the time he fell, plaintiff was engaged in making an unsafe place safe. In this connection, defendant cites Stone v. Mo. Pac. Ry. Co., 293 S. W. 367, and

other cases, holding that an employeé cannot recover from his master when injured while making the place where he is injured safe, or, is engaged in putting it in repair.

However, it is quite apparent that, at the time that plaintiff was injured, he was not engaged in doing the work that he was employed to do by defendant at extra compensation, that is, to reduce the incline of the space he was required to use in carrying coal from the bin to the stoker. While it is true, he was pointing out to defendant's husband what material he needed to complete the job, he was, also, on his way to fire the furnace, but the main distinguishing feature between this case, and those cited by defendant, is that plaintiff was not at the place he was employed to make safe at the time he slipped and fell. Defendant, herself, made a distinction between that place and the place he was employed to work upon, in that, she instructed him, directly, not to do any work south of the stoker.

Plaintiff's witness, Vann, testified that plaintiff, "I imagine slipped . . . at least two and one-half or three feet from where he fell." In view of this testimony defendant says that plaintiff actually fell only six to eighteen inches from the stoker. In separating the place where the accident happened from that where he had been carrying on his work of reducing the incline to the stoker, we are not concerned about where he fell, but with the place that caused his fall, which was a slick place in the concrete about three and one-half feet from the stoker and, at least, that far from where he had been doing the extra work in question. We are not called upon to say whether, had he slipped six to eighteen inches from the stoker or the place being remedied, that fact would have made any difference in our ruling.

However, it is insisted that plaintiff was guilty of contributory negligence, as a matter of law, "in stepping to the north out of this passageway onto said ramp, when he knew it was there, knew it was dangerous and knew he could not see where it began, without feeling with his foot for its edge."

In reference to the degree of darkness present, we might say it was not pitch dark. Plaintiff testified that he was able to distinguish defendant's husband when the latter came through the door and plaintiff turned around, at which time defendant's husband was eight or ten feet from him; that he was able to distinguish Vann, who was standing near the boiler and that there was sufficient light there to point out to defendant's husband the place where plaintiff had been working and to show him what material plaintiff needed; that the place being pointed out was five feet away. As to turning on the lights, plaintiff had been instructed not to do this. While he had been over the place where he fell "countless times" during the five years that he had been employed by defendant, he had complained to her about the condition, and she had promised to remedy it. Under such circumstances, plaintiff cannot be adjudged guilty of contributory

negligence, as a matter of law, unless the danger was so glaring, open and obvious as to threaten immediate and almost certain injury, or, otherwise stated, unless the danger was so glaring, open and obvious that a man of ordinary prudence would not attempt to use the place. [Fischer v. M.-K. Express Co. Inc., 158 S. W. (2d) 458, 461, 462.]

It is well settled that a servant, although he knows of the defect, may continue to work for such a reasonable length of time as may be required to make the promised repairs, unless the danger is so imminent or likely to cause injury that an ordinarily prudent person would not continue to work without assuming the risk. [Culver v. Minden Coal Co., 286 S. W. 745, 747.]

We cannot say, under all of the circumstances, that plaintiff was guilty of contributory negligence, as a matter of law.

We have examined the cases of Waldmann v. Skrainka Constr. Co., 233 S. W. 242; Senseney v. Landay Real Estate Co., 131 S. W. (2d) 595; Cash v. Sonken-Galamba Co., 17 S. W. (2d) 927; Murray v. Ralph D'Oench Company, 147 S. W. (2d) 623, and other cases cited by defendant, and find the facts in those cases not like those in the case at bar. Of course, the facts in all negligence cases differ. Cases of this kind are of little value except insofar as they lay down rules of law applicable in such cases. We might say, however, that no case cited by defendant, except that of Russell v. Johnson, 160 S. W. (2d) 701, is a master and servant case, and a distinction has been made between cases involving relations, such as those involved in the cases cited by defendant, and master and servant cases. [See Edmonston v. Hotel Statler Co., Inc., 267 S. W. 612, 615, 616.] The facts in the case of Russell v. Johnson, *supra*, are so unlike those in the case at bar as to make it entirely inapplicable.

Defendant says that plaintiff was guilty of contributory negligence, as a matter of law, in using a ramp having an incline of forty-five degrees. The jury was not required to believe that the ramp was of that slope. There was evidence that the incline was as little as fourteen degrees. While plaintiff testified that he thought the incline was forty-five degrees, this was but an estimate, and plaintiff was not conclusively bound by his testimony on this point. [Scott v. Kansas City Public Service Co., 115 S. W. (2d) 518, 523; State ex rel. v. Shain, 173 S. W. (2d) 406.]

The judgment is affirmed. *Cave, J.*, concurs; *Shain, P. J.*, not sitting.